```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS (EL PASO)

UNITED STATES OF AMERICA,   .  Case No.: 3:25-CR-01912-KC-1
                            .
          Plaintiff,        .
                            .
     vs.                    .
                            .
JESSICA LORRAINE TELLES,    .
                            .
          Defendant.        .  Friday, July 18, 2025
. . . . . . . . . . . . . . .  3:05 P.M.
```

**FILED**

September 11, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Diego Cesena_
                DEPUTY

```
               TRANSCRIPT OF PRELIMINARY HEARING
          BEFORE THE HONORABLE MIGUEL A. TORRES
             UNITED STATES MAGISTRATE COURT JUDGE


APPEARANCES:

For the Government:     United States Attorney's Office
                        BY: PATRICIA AGUAYO, ESQUIRE
                        700 East San Antonio Avenue, Suite 200
                        El Paso, Texas 79901
                        (915) 534-6884
                        Patricia.Aguayo@usdoj.gov


For the Defendant:      Office of the Federal Public Defender
                        BY: ELYSE MICHELLE SCHNEIDER, ESQUIRE
                        700 East San Antonio Avenue, D-401
                        El Paso, Texas 79901
                        (915) 534-6525
                        elyse_schneider@fd.org


Deputy Clerk:           Fidel Morales
                        United States District Court
                        525 Magoffin Avenue, Suite 105
                        El Paso, Texas 79901


Transcription Service:  Liberty Transcripts
                        9107 Topridge Drive
                        Austin, Texas 78750
                        (847) 848-4907
                        DBPATEL1180@GMAIL.COM


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

```
                             INDEX
```

|                                          | Page  |
|------------------------------------------|-------|
| Case called                              | 3     |
| Arguments on Probable Cause              |       |
|   By: Ms. Aguayo                         | 25,30 |
|   By: Ms. Schneider                      | 27,31 |
| Court's Ruling on Probable Cause         | 33    |
| Argument on Bond By: Ms. Schneider       | 34    |
| Court's Ruling on Detention/Bond         | 34    |
| End of Proceedings                       | 35    |
| Certification of Transcriber             | 36    |

WITNESSES FOR THE GOVERNMENT:

MARK MARTINEZ
    Direct Examination by Ms. Aguayo          4
    Cross-Examination by Ms. Schneider       12

WITNESSES FOR THE DEFENDANT:

 (None)

|                                   | Identified | Received |
|-----------------------------------|------------|----------|
| EXHIBITS FOR THE GOVERNMENT:      |            |          |
|  (None)                           |            |          |
| EXHIBITS FOR THE DEFENDANT:       |            |          |
|  (None)                           |            |          |

1        **EL PASO, TEXAS, FRIDAY, JULY 18, 2025, 3:05 P.M.**

2              COURTROOM DEPUTY:  All rise.  Magistrate Court is

3    back in session.  Please be seated.

4              THE COURT:  All right.  The Court calls EP:25-M-3969,

5    United States of America v. Jessica Lorraine Telles.  We're

6    here for a preliminary hearing.  Let me have announcements.

7              MS. AGUAYO:  Good afternoon, Your Honor.

8              Patti Aguayo on behalf of the United States.  Ready.

9              THE COURT:  Good afternoon.

10             MS. SCHNEIDER:  Good afternoon again, Your Honor.

11             Elyse Schneider for Ms. Telles.  We're ready to

12   proceed with both -- oh, I guess it's just a preliminary

13   hearing, but we did have something to add about detention, if

14   we could.

15             THE COURT:  Okay.  We can address that at the end if

16   that's fine.

17             MS. SCHNEIDER:  That's great.  Thank you.

18             THE COURT:  All right.  Very well.

19             And just for the record, I had set bond in this case.

20   I think it was $10,000, 10 percent.  We'll take that up at the

21   end of the hearing.

22             All right.  Pursuant to the Due Process Protection

23   Act, the Government is put on notice as to its disclosure

24   obligations under the Supreme Court precedent of <u>Brady v.</u>

25   <u>Maryland</u>.  The failure to comply with this obligation on the

Martinez - Direct

```
 1   part of the Government could result in sanctions on the

 2   Government.  A written notice to this effect will follow this

 3   hearing.

 4          Call your first witness, please.  The Government

 5   calls Mark Martinez.

 6          THE COURT:  All right.  Good afternoon.

 7          MR. MARTINEZ:  Good afternoon, sir.

 8           MARK MARTINEZ, GOVERNMENT'S WITNESS, SWORN

 9          THE COURT:  All right.  Go ahead and have a seat.

10   Stay about this far away from the mic.  Okay?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  All right, thanks.

13          All right.  You may proceed.

14          MS. AGUAYO:  Thank you, Your Honor.

15                     DIRECT EXAMINATION

16   BY MS. AGUAYO:

17   Q   Please state your full name, Agent.

18   A   Mark Raymond Martinez.

19   Q   How are you employed?

20   A   I'm a special agent, a computer forensics agent with the

21   Department of Homeland Security, Homeland Security

22   Investigations.

23   Q   Back on July 14, 2025, were you called out to duty?

24   A   Yes, ma'am.

25   Q   And were you called out at a port of entry?
```

Martinez - Direct

1   A    Yes, ma'am.

2   Q    Which one?

3   A    The Paso del Norte Port of Entry.

4   Q    And why were you called there?

5   A    The caller, the supervisory CPO, Customs and Border

6   Protection officer, told me that an assault had occurred

7   against a CBPO, and it's my duty to respond to those calls.

8   Q    And the Paso del Norte Port of Entry, is that here in El

9   Paso?

10  A    Yes, it is.

11  Q    Is it the downtown bridge here, just a few blocks away?

12  A    Yes, ma'am.

13  Q    Located within the Western District of Texas?

14  A    Yes, ma'am.

15  Q    And when you arrived, did you have occasion to speak with

16  the Defendant in this matter?

17  A    Yes, ma'am.

18  Q    And that's Jessica Lorraine Telles, correct?

19  A    Yes, ma'am.

20  Q    Prior to speaking with Ms. Telles, did you also have

21  occasion to speak with the officer who was allegedly assaulted

22  by Ms. Telles?

23  A    Yes, ma'am.

24  Q    What, if anything, did the officer tell you?

25  A    The officer stated that a scuffle had ensued, and he was --

Martinez - Direct

1  he felt that he was kicked in the back by someone that was

2  behind him, who he thought was Ms. Telles.  Well, let's break

3  this down.  Where did the scuffle occur at the Paso del Norte

4  Port of Entry?

5  A   The first scuffle occurred in Secondary, after the three

6  occupants of the vehicle were exiting the vehicle.  The first

7  scuffle occurred there where multiple CPOs were involved.

8  Q   Let me stop you there.  When you say Secondary, are we

9  talking about vehicular, or are we talking about the Secondary

10  area inside the building?

11  A   Yes, my apologies.  The vehicular Secondary, Secondary

12  vehicle inspection area is where they exited the vehicle, and

13  the first scuffle ensued.

14  Q   And was Ms. Telles a passenger in this vehicle?

15  A   Yes, ma'am.

16  Q   Was she related to anyone else in the vehicle?

17  A   Yes, she is the mother of one of the other occupants and

18  the aunt of the third occupant.

19  Q   When you say one of the occupants, would that have been the

20  driver of the vehicle?

21  A   Yes.  The driver of the vehicle was her son.

22  Q   And, so going back to this first scuffle, was this a

23  scuffle that involved Ms. Telles?

24  A   Yes, it did.

25  Q   And what happened in that scuffle?

Martinez - Direct

1  A    She was, appeared to be filming or taking pictures with a

2  cell phone.  She was asked to put the cell phone away or to

3  stow the cell phone.  The chief supervisory CBPO tried to grab

4  the cell phone, and she pulled it away and appears to raise her

5  hand.  And --

6  Q    Let me stop you there.  Can individuals use cell phones as

7  a recording device while they are at a port of entry?

8  A    Only within their vehicles.

9  Q    And did Ms. Telles follow the instructions by any of those

10  officers regarding her use of the cell phone?

11  A    No, she did not.

12  Q    And so you mentioned what happened when one of the officers

13  tried to take that phone away from her?

14  A    Yes.

15  Q    And what happened when one of those officers tried to take

16  the phone away from her?

17  A    She pulled the phone away and raised her hand.

18  Q    And at the point that she raised her hand, what did the

19  officers do?

20  A    The additional officers then handcuffed all three

21  individuals.

22  Q    And again, we're referring to the driver and the other

23  passenger that was in the same vehicle with Ms. Telles.

24  A    Yes, ma'am.

25  Q    And after they were handcuffed, where were they taken?

Martinez - Direct

1  A    They were then locked to Passport Control Secondary, which

2  is the pedestrian area.

3  Q    Passport Control Secondary, is that a secure area?

4  A    Yes, it is.

5  Q    How does one enter the Passport Control Secondary area?

6  A    There's multiple locked doors.  You have to be scanned in.

7  And it's a secure building.  It's a secure room within a secure

8  building behind the pedestrian inspection booths.

9  Q    And did Ms. Telles make it inside this Passport Control

10  Secondary area?

11  A    Yes.

12  Q    And what happened when she entered the Passport Control

13  Secondary area?

14  A    She was behind -- she was being led behind the CBPO that

15  was assaulted, who was holding her son by the handcuffs.  And

16  the CBP officer who was holding her son pushed her son against

17  a metal table that was there in Passport Control Secondary when

18  she then kicked the CBPO.

19  Q    And again, you're referring to she.  Are you referring to

20  Ms. Telles?

21  A    Yes, ma'am.

22  Q    The Defendant in the courtroom here today?

23  A    Yes, ma'am.

24  Q    Do you see her in the courtroom?

25  A    Yes, ma'am.

Martinez - Direct

1  Q    Would you please describe what she's wearing and where

2  she's sitting?

3  A    She's sitting next to defense counsel wearing a blue

4  jumpsuit.

5        MS. AGUAYO:   Your Honor, may the record reflect that

6  Agent Martinez has identified Jessica Lorraine Telles in this

7  matter?

8        THE COURT:   The record will so reflect.

9  BY MS. AGUAYO:

10 Q    Did you talk to the officer who was kicked by Ms. Telles?

11 A    Yes, ma'am.

12 Q    What, if anything, did he tell you regarding where she

13 kicked him?

14 A    He said she was kicked in the upper middle back.

15 Q    Did you have occasion to see the officer's upper middle

16 back?

17 A    I saw a picture of it provided by another agent.

18 Q    What, if anything, did this picture reflect?

19 A    Just redness in the area.

20 Q    Did you also have occasion to speak with Ms. Telles?

21 A    Yes, I did.

22 Q    What, if anything, did she say regarding this kick to the

23 officer?

24 A    To me, she did not make any mention of any strike or hit to

25 any CBPO.

Martinez - Direct

1  Q    You say to you.  Does that mean she had a conversation with

2  other law enforcement officers?

3  A    Yes, ma'am.

4  Q    Who did she talk to?

5  A    She spoke to CBP Officer Professional Responsibility agents

6  who had been there before I arrived on scene.

7  Q    And what, if anything, did she tell these OPR agents

8  regarding this kick to the officer?

9  A    She made a comment similar to, if they say I kicked him, it

10  was because my leg flew out and hit him.

11  Q    My leg flew out and hit him?

12  A    Yes, ma'am.

13  Q    Was this interview recorded?

14  A    Yes, it is.

15  Q    Have you seen the interview?

16  A    Yes, ma'am.

17  Q    Is it both video and audio?

18  A    It is both video and audio.

19  Q    And did you hear her say that to these OPR agents who

20  interviewed her?

21  A    Yes.

22  Q    And did you also see any recordings regarding the incident

23  itself?

24  A    Yes, I did.

25  Q    Would you describe to the Court what you saw in these

Martinez - Direct

1  videos?

2  A    The video itself is very grainy, but the audio is clear.

3  Once a scuffle ensues, what I believe to be a female CBP

4  officer says something along the lines of, Chief, you should

5  check him out, he just got kicked.

6  Q    And once again, you're referring to it as a scuffle.  So

7  just to be clear, you're referring to the first scuffle that

8  occurred out in Secondary or the second scuffle inside Passport

9  Control Secondary?

10 A    This is the second scuffle within Passport Control

11 Secondary.

12 Q    So you heard an officer alert a supervisor regarding this

13 kick?

14 A    Yes.

15 Q    And what, if anything, do you hear the supervisor saying

16 after that?

17 A    I don't -- I can't tell who says what after that point.

18 There's just commentary -- there's other voices that say, I did

19 and I did not, or she didn't or she did.  It's very hard to

20 tell at that point.

21 Q    Can you tell if it's Ms. Telles saying this, or is it other

22 officers saying this?

23 A    At that point, I can't tell.

24 Q    You mentioned that these OPR agents spoke with Ms. Telles

25 before you arrived.  Do you know what the time span is, first

Martinez - Direct

1  of all, about what time did this incident occur?

2  A    The alleged assault occurred just after midnight, maybe

3  between 12:05 and 12:15.  I'm not exactly sure what time.

4  Speaking to the OPR agents, they were called out between 1:00

5  and 1:30, and they didn't arrive until 3:00 a.m.  I was not

6  called until after 3:30.

7  Q    And that would be 3:30 in the morning?

8  A    Yes, ma'am, 3:30 a.m.

9         MS. AGUAYO:  May I have a moment, Your Honor?

10        THE COURT:  You may.

11     (Whereupon, there was a brief pause in the proceedings.)

12  BY MS. AGUAYO:

13  Q    And just to make sure, Agent Martinez, did you actually

14  speak to the victim?

15  A    The CBP officer?

16  Q    Yes.

17  A    Yes, ma'am.

18  Q    And did he say that he felt the kick itself?

19  A    Yes, he did.

20  Q    Did he mention if he felt any pain?

21  A    No, he did say that it felt like it moved him.

22  Q    Like it moved him, okay.

23        MS. AGUAYO:  Pass the witness, Your Honor.

24        THE COURT:  Ms. Schneider.

25                      CROSS-EXAMINATION

1  BY MS. SCHNEIDER:

2  Q    Good afternoon.

3  A    Good afternoon, ma'am.

4  Q    There's been a lot of news stories lately about immigration

5  officers arresting people, correct?

6  A    Yes, ma'am.

7  Q    And, in fact, there's even been stories of some citizens

8  getting arrested by ICE agents.  Correct?

9            MS. AGUAYO:  Your Honor, objection to relevance.

10           THE COURT:  Sustained.

11           MS. SCHNEIDER:  Your Honor, if I can explain?

12           THE COURT:  Go ahead.

13           MS. SCHNEIDER:  This goes to her mindset at the time.

14  There has to be some sort of mens rea.  And if this is out in

15  the world, stuff that people are seeing every day, it affects

16  whether she feels safe in that situation?

17           THE COURT:  It may or may not, but I don't think it's

18  relevant for a probable cause hearing.  So the objection is

19  sustained.

20  BY MS. SCHNEIDER:

21  Q    I want to clear something up.  The video that you said was

22  grainy and you can just hear the audio.  That's the video of

23  this alleged kick?  Is that correct?

24  A    Yes, ma'am.

25  Q    Okay.  So you don't actually see a kick on that video,

1  correct?

2  A    That is correct.

3  Q    And you hear a female officer saying something about a

4  kick?  Yes, ma'am.

5  Q    And do you ever interview that officer, that agent or

6  officer?

7  A    No, we're trying to identify that officer at this time.

8  Q    When you spoke with the alleged victim in this case, did

9  you ask him who that officer was?

10  A    We have a list of CBP officers who are on duty, and we

11  requested statements from them, but have not received them yet.

12  Q    As far as you know, for example, when you were on scene,

13  there was no witness to an alleged kick, correct?  No

14  eyewitness, I should say.

15  A    We did believe there was an eyewitness.  We just didn't

16  know who that person was.

17  Q    What steps did you take to try to figure out who that

18  person was while you were on scene?

19  A    We received a list of CBP officers who were involved in any

20  shape or form to the incident from the time they arrived in

21  Primary up to the time I arrived.

22  Q    And this happened on July 14th, correct?

23  A    Yes, ma'am.

24  Q    And it's July 18th today?

25  A    Yes, ma'am.

1   Q   And you still haven't been able to figure out who that CBPO

2   officer was?

3   A   No, ma'am.

4   Q   If that female officer said something about a kick,

5   Ms. Telles was in the room to hear that, correct?

6   A   I would believe so.

7   Q   Now, when this alleged kick happened, was the alleged

8   victim bent over?  Was he standing up?

9   A   I do not know.

10  Q   Okay.  Do you know how tall he is?

11  A   The victim?

12  Q   Correct.  The alleged victim, yes.

13  A   I don't know.

14  Q   Can you give me an approximation?  Is he tall?  Is he

15  medium?  Is he short?

16          MS. AGUAYO:  Your Honor, objection, now we're going

17  to speculation.  The agent has said he doesn't know.

18          THE COURT:  I'm going to overrule the objection.  I

19  mean, to the extent that he knows and can give a description,

20  I'll allow that.

21          THE WITNESS:  He's a large-build individual, maybe

22  between five-five and five-eight.

23  BY MS. SCHNEIDER:

24  Q   And I apologize, I just asked this and forgot the answer.

25  Did you say he was bent over or was he standing up?

1   A    I was not there and I couldn't tell.

2   Q    Okay.  And as far as you know, Ms. Telles is around

3   five-four, correct?

4   A    That's correct.

5   Q    And she doesn't appear to be an extremely flexible human

6   being, correct?

7         MS. SCHNEIDER:  Again, Your Honor, objection to

8   speculation.

9         THE COURT:  Sustained.

10  BY MS. SCHNEIDER:

11  Q    Now, I want to go back to, all the way back to this alleged

12  scuffle in Secondary.  Was Ms. Telles in the vehicle when she

13  had the phone with her or was she out of the vehicle?

14  A    In both instances, she had her phone according to what I

15  was told by CBP officers.

16  Q    And while she had her phone, was she in the vehicle or was

17  she out of the -- you mean she had it as well when she was out

18  of the vehicle, is that what you're trying to say?

19  A    Both inside and outside the vehicle, yes, ma'am.

20  Q    And is there a video of her raising her hand or was that

21  just based on statements?

22  A    It's in the video, yes, ma'am.

23  Q    Okay.  She didn't slap anyone, correct?

24  A    That's correct.

25  Q    She didn't threaten anyone, correct?

1    A    There's no audio in the video.  I do not know.

2    Q    One moment, please.  Now, when they're in Secondary, how

3    many officers are in that area?

4    A    I'm sorry, just to clarify, is this for vehicle Secondary

5    or in Passport Control Secondary?

6    Q    Vehicle Secondary.

7    A    So it's over a period of time.  There's at least four that

8    I can see in the video, but they do all retreat from the

9    vehicle for a short time before the individuals exit the

10   vehicle.  Then they come back after the phone is -- after the

11   chief supervisory officer tries to take the phone away from

12   Ms. Telles.

13   Q    Okay.  Then the four people come back?

14   A    Yes, at least four.  I don't -- it could be.  I don't

15   remember exactly.

16   Q    And it's at that point that they put everyone there in

17   handcuffs, correct?

18   A    That's correct.

19   Q    Okay.  And while Ms. Telles, her son, and her niece are in

20   handcuffs, her son gets injured, correct?

21   A    During the walk from vehicle Secondary to Passport Control

22   Secondary, the son does fall, yes.

23   Q    And that's through no fault of his own, correct?  He just

24   fell.  He just tripped and fell?

25   A    I cannot tell from the video, and I did not witness it.  He

1    was being taken along by an officer, correct?

2    A    Yes, that's correct.

3    Q    Okay.  And the officer was holding on to his arm, correct?

4    A    Yes.

5    Q    Are you aware that there's a finger-like bruise on his arm

6    where he was being held?

7    A    I did see -- I did take pictures of bruises on his arm, but

8    I do not know from where they came.

9    Q    And it was while he was being taken along that he fell or

10   something, correct?

11   A    That's correct.

12   Q    And he had bruises and scrapes up and down his leg,

13   correct?

14   A    That is correct.

15   Q    And after this, while he was in handcuffs, he's looking

16   back, and that's what bothered the officers, correct?

17   A    I do not -- I do not recall.

18   Q    In the complaint that you wrote, correct?

19   A    Uh-huh.

20   Q    It does mention that he continued to look back, and the

21   officers told him not to.

22   A    That was from once they entered into Passport Control

23   Secondary.

24   Q    Okay.

25   A    So this was -- the trip and fall was on the way from

1   Vehicle Secondary to Passport Control Secondary.  What's in the

2   statement is what you're referring to, I believe, is once they

3   entered into the building or into the office at Passport

4   Control Secondary.

5   Q   Okay, so the issue was that he was looking back, correct?

6   And the officers told him not to do that.

7   A   The statement from the CBP officer states that he was

8   refusing commands and was trying to turn around.

9   Q   He wasn't trying to get out of their grasp, was he, at any

10  point?

11  A   I do not know.

12  Q   They didn't say that to you, did they?

13  A   I do not recall.

14  Q   And at some point, one of these officers pushed him down on

15  the table while he was in handcuffs, correct?

16  A   Yes.

17  Q   And so he had his hands behind his back, is that right?

18  A   Yes.

19  Q   And he had his head down on the table?

20  A   I do not know if his head was on the table.

21  Q   You don't know if the officer's hand was on his head while

22  he was on the table?

23  A   I cannot see that from the video.

24  Q   Okay.  Is it protocol to push someone down on a table like

25  that without having committed any offense?

```
 1              MS. SCHNEIDER:  Your Honor, objection to relevance.

 2   This is in regards to what the officers' encounter with the

 3   Defendant's son, not the Defendant herself.

 4              THE COURT:  Where are you going with this?

 5              MS. SCHNEIDER:  Your Honor, I think it goes to

 6   credibility, and it also goes to the mindset of Ms. Telles in

 7   the moment, seeing that happen to her son.

 8              THE COURT:  Look, I'm going to overrule the

 9   objection, but I don't think we need to spend a lot of time on

10   this.

11              MS. SCHNEIDER:  Okay, Your Honor.

12   BY MS. SCHNEIDER:

13   Q   Is that within protocol for officers to do that to

14   somebody?

15              MS. AGUAYO:  Again, Your Honor, objection to

16   speculation and to relevance.

17              THE COURT:  I don't think that's relevant for this

18   hearing.

19   BY MS. SCHNEIDER:

20   Q   Okay.  So just to be clear about this alleged kick, the

21   officer had his back turned to Ms. Telles when this alleged

22   kick happened, correct?

23   A   To my understanding, yes.

24   Q   Do you know who was in the room at the time this happened?

25   A   We have a list of people that were in the room.  I do not
```

1   know.  I do not have that list in front of me.

2   Q   Would you say it's around five people?  More?

3   A   It's probably more.

4   Q   Okay.  Ten?

5          MS. AGUAYO:  Your Honor, again, objection to

6   speculation.  The question has already been asked.  The agent

7   has testified that there were approximately four officers, at

8   least at the time of the Vehicle Secondary, and I would object

9   to relevance.

10          THE COURT:  I'm going to overrule that.  I mean, if

11  you know, answer the question if you don't.

12          THE WITNESS:  Yes, sir.  Yes, Your Honor.

13  BY MS. SCHNEIDER:

14  Q   Do you know if it was about ten?

15  A   I don't know exactly how many.

16  Q   Okay.  But more than five, correct?

17  A   At least five.

18  Q   Okay.  How big is this room?

19  A   It's a relatively large room.  There's a desk in there.  It

20  may be about the size of this courtroom.

21  Q   How close were people together?

22  A   I don't understand the question.

23  Q   How close was everyone in proximity to each other?

24  A   So the three Defendants were walked in -- sorry, the three

25  passengers of the vehicle were walked into Passport Control

1  Secondary, each with one CBPO escort.  But there were

2  additional people in Passport Control Secondary that may not be

3  involved with the incident.

4      There were people behind the desk.  There were other people

5  in the room that I don't believe were involved in the incident

6  at the time.  So as in close proximity, as they walked in the

7  door, they were relatively close.

8  Q    How many people were behind the alleged victim when this

9  alleged kick happened?

10  A    I can't tell by the video.

11  Q    It was more than Ms. Telles, though, correct?

12  A    Yes, ma'am.

13  Q    And this video was so grainy, again, you couldn't see any

14  kick, correct?

15  A    That's correct.

16  Q    Did this officer go to the doctor at all?

17  A    No.  But there are on-staff contracted medical personnel

18  that I think checked out the passengers in the vehicle and the

19  CBPOs, as well.

20  Q    Was Ms. Telles' niece behind the officer, as well?

21  A    I don't know.  Okay.

22  Q    Did the agent who says -- Agent Alvarado, he's the agent

23  that says Ms. Telles said, if someone's saying I'm kicking him,

24  that was my leg just flew out or something like that.  He's the

25  agent that said that she said that to him, correct?

1   A    Yes, and I watched the video, as well, the interview video.

2   Q    The interview that -- correct.  Did he read her Miranda

3   before he spoke with her?

4   A    No, he did not.

5   Q    And this was well after the alleged offense, correct?

6   A    Can you clarify what well after would mean?

7   Q    Good question.  Was it a couple hours after this alleged

8   offense?

9   A    I don't know exactly when the interview occurred.  It was

10  before I arrived, so it had to be between 3:00 a.m. and 5:00

11  a.m.

12  Q    But it was after this time on the video where the female

13  officer said something about a kick, correct?

14  A    Yes, that's correct.

15  Q    And he wasn't an eyewitness to any of this, correct?

16  A    Who does this mean?

17  Q    Special Agent Alvarado.

18  A    Oh, no, he was not.

19  Q    And he didn't speak to the female officer that said

20  something about a kick, correct?

21  A    I don't know.  I don't know which CBPOs he talked to.

22  Q    He had a working relationship with the officers involved,

23  correct?

24  A    I'm sorry, can you clarify?

25           MS. AGUAYO:  Your Honor, objection to relevance.  The

Martinez - Cross

1  relationship that this OPR agent may have with CBP officers at

2  the port that night?

3           THE COURT:  I mean, overruled, but where exactly --

4  try to clarify a little bit about where you're going with this.

5           MS. SCHNEIDER:  Sure, Your Honor.  I guess I'm just

6  trying to clarify that.  And I won't want go any further.

7  BY MS. SCHNEIDER:

8  Q   That's the only question I had on this was you -- Special

9  Agent Alvarado has a working relationship with the alleged

10 victim, correct?

11 A   The OPR agents investigate misconduct by CBPOs, so that

12 would be the only relationship they have in that working

13 instance.

14 Q   So he works for -- he basically investigates other

15 officers, correct?

16 A   Special Agent Alvarado, yes, that's correct.

17 Q   And that's why he was involved in this case, correct?

18 A   That's correct.

19 Q   And they investigate officers when there's allegations that

20 there's excessive force and things like that, correct?

21 A   I believe they're called for any assault on a CBPO.

22 Q   Did he ask Ms. Telles any more questions to describe what

23 she meant by that statement?

24 A   I don't recall.  I've not been able to transcribe the video

25 and watch the entire thing.

1  Q    So you just watched the part where she said that?

2  A    Snippets from that video and the other videos, yes, ma'am.

3  Q    But you did not watch the entire thing, correct?

4  A    That's correct.

5            MS. SCHNEIDER:  Nothing further.

6            THE COURT:  All right, anything else?

7            MS. AGUAYO:  No, Your Honor.

8            THE COURT:  All right, Mr. Martinez, you can step

9  down, sir.

10           THE WITNESS:  Thank you, Your Honor.

11        (Whereupon, the witness was excused.)

12           THE COURT:  Any other witnesses or evidence?

13           MS. AGUAYO:  No, Your Honor.

14           THE COURT:  Any witnesses or evidence?

15           MS. SCHNEIDER:  Your Honor, I'd only proffer that I

16 did speak with her son.  He's in the audience right now, and he

17 does have a bruise that appears to be the size of a finger on

18 his arm.

19           THE COURT:  All right, very well.  Let me hear

20 argument, please, as to probable cause.

21           MS. AGUAYO:  Your Honor, the night of or early

22 morning hours around July 14, 2025, you have two individuals

23 who are noncompliant and combative with CBP officers as they

24 try to enter the United States at a port of entry.  Ms. Telles

25 ultimately kicked an officer, Your Honor.  Individuals cannot

1   assault, attack, resist, impede, in general, assault any type

2   of law enforcement officer, especially at a port of entry when

3   they're the ones, when these individuals are the ones, who are

4   trying to come in into the U.S.

5           We would ask the Court to find probable cause

6   regarding Ms. Telles' conduct that night with the victim in

7   this matter.  And we recognize that we did not file a motion to

8   detain, but we would also ask the Court to take judicial notice

9   of the Pretrial Services Report, which lists numerous warrants

10  that Ms. Telles has pending against her.  Thank you.

11          MS. SCHNEIDER:  Your Honor, just to be clear, I have

12  not seen a Pretrial Services Report.  So I don't know if it's

13  just the Government got that.

14          THE COURT:  Well, I mean, and the reason why was

15  there was no motion filed.  I granted bond that first day.  So

16  although there is Information, you're welcome -- you're welcome

17  to have my copy if you would like.

18          MS. SCHNEIDER:  My understanding is that they're

19  traffic warrants.  Is that correct, Your Honor?

20          THE COURT:  Yes, there's a number of traffic

21  warrants, but there's also information about criminal history

22  and other things.

23          MS. SCHNEIDER:  Okay.

24          THE COURT:  Okay.  I'll just -- Fidel?

25          MS. SCHNEIDER:  Thank you, Your Honor.  I appreciate

1   it.

2          MS. AGUAYO:  Your Honor, because while we're

3   discussing the Pretrial Services Report, Defense will also see

4   that Ms. Telles was involved in similar conduct 20 years ago.

5          MS. SCHNEIDER:  I don't see similar conduct except

6   for -- oh, I see what you're talking about, in 2004.

7          THE COURT:  That's right.

8          MS. SCHNEIDER:  Yes, 20 years ago, more than 20 years

9   ago, I would say.

10          THE COURT:  Right.  Okay, let me hear your argument,

11   please.

12          MS. SCHNEIDER:  I'm just going to pass the report, if

13   that's okay.

14          Your Honor, if I can start with probable cause.  I

15   don't think there's probable cause here.

16          THE COURT:  Well, and it's only a probable cause --

17          MS. SCHNEIDER:  That's correct.

18          THE COURT:  -- hearing.  Okay, so --

19          MS. SCHNEIDER:  Of course, Your Honor.  Thank you.

20          THE COURT:  Go ahead.

21          MS. SCHNEIDER:  Thank you for reminding me of that.

22   I want to start off by saying you heard no evidence that there

23   was anything found in the car because there was nothing found

24   in the car.  We know tensions are high right now with what's

25   going on with ICE agents arresting people on the street and

1    things like that with masks on.  This is the context in which
2    this happened.  I think we have to remember that.
3            The scuffle that they talk about in Vehicle Primary
4    is literally them trying to rip the phone away from her, and
5    her putting her hand up, not slapping anyone, not threatening
6    anyone.  It's putting her hand up when someone rips the phone
7    out of her hands.  Then they put these three people, who have
8    at this point committed no crime whatsoever, in handcuffs, and
9    they take them to this other room, again, no crime having been
10   committed.  Poor Carlos trips over something, hurts himself
11   while he's being dragged over there, has a bruise on his arm,
12   which suggests he was pretty strongly dragged over, which
13   that's not coming out of nowhere, Your Honor.
14           If he's later than pushed down onto a desk with his
15   hands behind his back up in the air, that sounds pretty painful
16   to me, and it doesn't surprise me that he has a bruise on his
17   arm.  This is the context in which all of this was happening.
18   They're clearly not happy with Ms. Telles, with her son, with
19   her niece.  Tensions are high.
20           The bigger thing, though, is absolutely no one saw
21   Ms. Telles hit him at any point, or kick him, or assault him in
22   any way.  He didn't see it.  There's no witness saying they saw
23   it.  You'd think they'd immediately let people involved know,
24   wait, I just saw her kick him.  There's some garbled voices of
25   a female officer saying something about kicked.  The only thing

1    that says to me is that Ms. Telles, that's the allegation that

2    they're making against her.  So it sheds a lot of light on what

3    she allegedly later said to Special Agent Alvarado about the

4    kick.  That didn't come out of nowhere.  It wasn't that she was

5    trying to cover up something she knew she did.

6            And if someone's making that kind of allegation,

7    you'd think, why would they think that about me?  Why would

8    they think that I did that?  There is absolutely -- there's

9    nothing on the video showing that she did that.  Even though

10   it's grainy, you'd expect to at least see someone's leg go up

11   and hit someone.

12           Also, I would note, this officer, this alleged

13   victim, is described as, what is the exact word that was used,

14   a larger man.  And Ms. Telles is only five-four.  So if he was

15   there in front of her, she would have had to kick her leg

16   pretty high to get to his upper middle back.  I don't know how

17   anyone, even someone extremely flexible, does that.  There is

18   just not enough here to suggest that Ms. Telles assaulted

19   anyone.

20           And to be honest, I'm pretty saddened that she was

21   even charged in this case.  There's just not enough evidence

22   here, Your Honor.  Thank you.

23           THE COURT:  All right.  I'd like the Government, just

24   kind of by way of rebuttal, since it is your burden, just

25   address the issues.  What is the evidence that there was a

1  kick?  I mean, we've got a video that is grainy and maybe not

2  conclusive.  We've got a statement from the Defendant, which, I

3  mean, I'll just note, it was not after any kind of Miranda

4  warnings but she --

5          MS. AGUAYO:  May I approach the podium, Your Honor?

6          THE COURT:  Yeah, yeah, come on up.  So, I mean,

7  address those issues.  And what is the Government's evidence

8  that a kick occurred?  There was some testimony that I think

9  the officer that got kicked, that I think that there was some

10 physical evidence like red -- you know, that part of the

11 officer's back was red.  But go through that again for me.

12         MS. AGUAYO:  Your Honor, Agent Martinez testified

13 that while the video may have been grainy, the audio is very

14 clear.  After Ms. Telles kicked the victim, that there is

15 someone, and the assumption is it's another CBP officer, who

16 brings it immediately to the attention of a chief who was in

17 Passport Control Secondary.  There is a possible eyewitness.

18 Agent Martinez said that he is still going through the list of

19 other officers who were working that night, and he is still

20 investigating, trying to identify whose voice that was and who

21 actually was the eyewitness to the kick.

22         You also have Ms. Telles on her own admitting to CBP

23 OPR agents and refusing to describe it as a kick, described it

24 as my leg flew out and hit him.  Your Honor, in simpler terms,

25 it was a kick.  Regarding the size and the difference in height

1   between Ms. Telles and this officer, when you have an officer

2   who's bent over, Your Honor, I don't think you need to be very

3   flexible to be able to hit him above the waist.

4          We would ask the Court to find probable cause.  There

5   is sufficient evidence at this proceeding, Your Honor, to find

6   that Ms. Telles made contact with an officer when she shouldn't

7   have, that she forcibly was resisting, was interfering, was

8   impeding in the duty of a CBP officer.

9          THE COURT:  And you're taking the position, to be

10  clear, that she was -- you've charged it as assault, resisting,

11  and impeding.  Your position is she's done all three?

12         MS. AGUAYO:  That's correct, Your Honor.  And as the

13  Court knows, there are six prescribed acts under Section 111.

14  And at this juncture, the Government has chosen to charge her

15  with at least one of three means of assaulting an officer, and

16  we would ask the Court to find probable cause on any one of

17  those three.

18         THE COURT:  All right, very well.  Thank you.

19         MS. SCHNEIDER:  Your Honor, could I be heard briefly?

20         THE COURT:  I'll let you have the last word, briefly.

21         MS. SCHNEIDER:  Thank you.  Your Honor, I didn't hear

22  any evidence of resisting or impeding either, so I don't know

23  where that's coming from.  It would all have to be based on

24  this alleged kick.  We also don't have --

25         THE COURT:  Let me just, I'm sorry for interrupting,

 1  | but impeding --

 2  |          MS. SCHNEIDER:  Yes.

 3  |          THE COURT:  -- I mean, that can go basically to any

 4  | action, and that's kind of at the other end of the continuum in

 5  | this statute, which is --

 6  |          MS. SCHNEIDER:  Right.

 7  |          THE COURT:  -- you know, it's not the best worded

 8  | statute, I don't think.  You know, so it starts off with an

 9  | assault causing some kind of injury.  And at the other end of

10  | the spectrum, you have impeding or basically behavior that

11  | indicates that you're not following the commands, legally

12  | issued, lawfully issued commands of a law enforcement officer.

13  | I mean, there was testimony, I mean, that she was not complying

14  | with those instructions.

15  |          MS. SCHNEIDER:  Just to be clear, Your Honor, I don't

16  | know if you're speaking about the phone.  Is that what --

17  |          THE COURT:  About giving up the phone and not

18  | following the instructions with regard to the filming.  That's

19  | the testimony that I heard.

20  |          MS. SCHNEIDER:  Right.  And I am not sure if that was

21  | happening while she was in the car or while that was happening

22  | -- and it has to be a lawful order, Your Honor, is my

23  | understanding.  If she was in the car when they told her to

24  | stop doing that and she didn't, then it's not a lawful order.

25  |          I still, Your Honor, do not think there is even a

1  probable cause here.  The only thing that they had that he

2  possibly had some sort of contact with his back was redness.  I

3  mean, we don't know if he has eczema, we don't know if he had

4  an itchy back at the time.  We have no idea what happened to

5  this guy.  I mean, it's something that is very common and

6  doesn't suggest any sort of injury.  There's no footmark,

7  there's nothing like that.

8          And what stood out to me is that the Government may

9  have an eyewitness, but they don't at this point.  They didn't

10  wait to charge her until they actually had the facts straight

11  and could say, you know what, I saw this happen.  They charged

12  her without any of that evidence, and that's why there's no

13  probable cause, Your Honor.

14          THE COURT:  All right, thank you.

15          All right, let me take just a moment.

16      (Whereupon, there was a brief pause in the proceedings.)

17          THE COURT:  You know, I do believe there's enough for

18  probable cause in this case.  I am going to find probable

19  cause.  Certainly that she impeded, that some of her actions

20  were resisting, and there's at least the allegation of assault.

21  It may not be the strongest on the evidence with regard to the

22  assault, but there is some evidence of that, enough to get past

23  the low standard for probable cause.

24          You wanted to bring up an issue with regard to

25  detention again.  I issued a bond, I think it was $10,000, 10

1   percent, with her residing at Dismas Charities.  What did you

2   wish to address?

3           MS. SCHNEIDER:  Yes, Your Honor.  It seems that

4   probable cause was based mostly on the misdemeanor allegation

5   of impeding.  I don't want to put words in the Court's mouth.

6   But at this point, that sort of changes things.  And in

7   general, it seems to be an incredibly weak case.  That is too

8   much money for her to make.  Her family, her husband and her

9   son are in the courtroom now, but that is too much money for

10  them.

11          We were hoping for some sort of signature bond.  And

12  if the Court is insistent on her staying at the halfway house,

13  we understand that, but that the Court would consider her going

14  back to her home, which is more comfortable for her, obviously.

15          THE COURT:  Right.  And I think there was an issue

16  with that.

17          MS. SCHNEIDER:  Yes.

18          THE COURT:  Look, and I'm going to let you have my

19  copy of it.

20          MS. SCHNEIDER:  Oh, thank you very much, Your Honor.

21          THE COURT:  So you can have it.  Here's what we can

22  do.  And Mr. Morales can give that to you right now.  But what

23  I'm going to do is this.  Take a look at that, and you can

24  review it.  If we need to reopen the detention, you can file

25  something appropriate.  The reason that I went with a

1   percentage bond is she does have a prior history of assaultive

2   behavior, including one, as you mentioned, I mean, it's 20

3   years old or a little bit older, but it's an assault on an

4   officer charge, as well.

5          But she's got a number of traffic warrants, which

6   gives me some concern about how seriously she takes

7   instructions from the Court to show up, which is why I went

8   with that.  At the same time, I want to make absolutely sure

9   that if this amount of money that she would have to put on

10  deposit with the Clerk's is not achievable by her or her

11  family, that we know.  I mean, I think it's warranted in this

12  case, but I want to see where we are on this and just to see if

13  there's -- I would like the family to try to make that amount.

14  I don't think $1,000 is an -- it's an onerous amount, but you

15  can come back to the Court with that.

16         The other thing was there was a problem with the

17  residence, which is why I made the condition of her residence

18  Dismas Charities.  If you can find some alternative, or if you

19  can address some of the issues raised in the Pretrial Services

20  Report, we'll reopen the hearing.  All right?

21         MS. SCHNEIDER:  Thank you, Your Honor.

22         THE COURT:  All right, very well.  We're in recess on

23  this case.

24      (Whereupon, at 3:47 p.m., the proceedings were adjourned.)

25                        * * * * *

```
1                    C E R T I F I C A T I O N

2         I, DIPTI PATEL, court-approved transcriber, certify that

3    the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter, and to the best of my ability.

6

7

8    _____

9    DIPTI PATEL, AAERT CET-997

10   Expires: December 6, 2026

11   LIBERTY TRANSCRIPTS          DATE:  September 10, 2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```